On Application for Rehearing.
The counsel for the defendant, in their brief, filed in support of the application for rehearing, say:
“Craig says his feet were kicked from under him, yet search the *1713 “ record in vain, and not another witness says as much. If he was false “ in these particulars, it was an easy matter for him to be false in all.”
With no particular effort, we have found the following testimony upon the subject mentioned, beginning with that of Craig, the plaintiff, to whom the counsel refer, to-wit:
Lewis Craig: “He said, ‘get off here’, and I turned around towards “ the depot, and then he kicked me; and when he kicked my feet from “ under me, I held hold of that little thing by the steps that you pull up “by; I held hold of that with my left hand, but the train jerked me and “ I had to turn loose, and it rolled over my arm. I was standing on the “ steps when he kicked me.”
Elmore Jackson: “Q. Did you see Tony Smith kick him? A. Yes, “ sir; I saw him kick him. Q. Did you see the boy fall off ? A. When “ he kicked him, he disappeared to my eyes; I was on the ground, and “ couldn’t see across. Q. What side was he on ? A. Next to the de- “ pot, and I was on the side next to the saloon. After he fell, I could “ not see him until the train passed, and then I saw him get up with “his arms folded like this (illustrating). Q. Did you recognize Mr. “Tony Smith? A. Yes. Q. How long have you known him? A. “ I was raised where he was; I lived there for a number of years after he “moved there. Q. There is no doubt about his actually being the “man who kicked Lewis Craig off? A. He was the man; I saw him.
^ vc1 75* vr ■K*
“ Q. Did Lewis make any statement at that time, as to how it happened? A. Yes, sir; he said ‘That man kicked me off.’ ”
Lewis Stephens:
“Q. Where was the boy at the time you saw him? A. He was “ standing on the coach steps, and that man, Tony Smith, kicked him “off the train. * * * Q. You saw this man kick the boy off the “train? A. Yes, sir; I saw him kick the boy off the train. Q. There “ is no doubt about it, you saw him kick him? A. Yes, sir; I saw him “kick him off the train. Q. You saw the boy fall? A. Yes, sir. Q. “ And when you next saw him, his arm was mashed ? A. Yes, sir.”
Cross-examined:
“Q. How did the boy fall; did the man kick him clear loose, or did the boy hang by the rail a little while ? A. When the man kicked him, “ he fell and hung a little while; he hung on to it a little while.”
Robert Wood:
*1714 “Q. What is your employment? A. I work for the Express Oom“pany. * * * Q. Do you remember anything about the date on “which Lewis Craig is said to have been injured at the Union Depot? “A. I do not remember the date. Q. Do you remember the fact; “were you at the depot at the time? A. Yes. Q. What were you “ doing ? A. Loading the express wagon. Q. Did you see the oceur“rence? A, No, sir; I did not see it at the time it happened. Q. “ State whether or not, about that time, you heard any voices or cries or “ exclamations in regard to that accident ? A. I did. Q. What were “ they. A. I heard them say, the man with the white shirt on kicked “ the boy off. Q. Was that right at the time of the accident? A. It a was about two or three minutes before the boy got in front of the “wagon. Q. Did you see the boy ? A. Yes, sir. Q. What was his a condition ? A. George was leading him, and his other arm was hang- “ ing; I stopped work to look at him * * * Q. Did you see Tony “ Smith there that day ? A. Yes, sir. Q. How long have you known “him? A. Since before he was grown good; I knew his father well, “ he has been around the bridge here for five or six years.”
The learned counsel refer to this testimony and say that Jackson does not testify that Craig was kicked off the t^-ain, but that (having been kicked) he disappeared from the eyes of Jackson, who was upon the other side, and could not see across. It will be observed, however, that Jackson also testifies, that when the train passed, he saw Craig “get up, with his arm folded liked this” (probably demonstrating the manner in which the boy held his crushed arm). As to Stephens, the counsel say that his “evidence is so emphatic, and manifestly exaggerated, that, in every line, his bias is shown.” Nevertheless, he is another witness who “says as much” as Craig; and whether he is exaggerating, or is biased, is a good deal a matter of opinion. The counsel for the plaintiff seem to think 1hat he is not, and this court is also of that belief. Counsel for defendant state that Henry Toney, a witness for the plaintiff, “says postiively that the boy jumped off, and was not kicked or pushed off”. That was evidently the impression which Toney received from his point of observation, and he so testified when first on the stand, but, upon being recalled, he testified as follows: “Q. You stated in your direct examination that you saw a man on the platform, and saw the boy jump off, did you mean the jury- — —” (objected to by counsel for defendant). “Q. Can you swear that Toney Smith did not kick that b<-y off that *1715 train? A. No, sir; I cannot. Q. You say that you did not see him kick him? A. No, sir; I did not see him kick him. Q. Can you swear positively that he did not kick 'him ? A. No, I cannot. Q. (by juror). Did not you swear that you saw him jump off? A. I said that the man made him jump off. Q. How far was the man from the boy when the boy jumped off? A. He was opposite the coach door. Q. On the inside of the coach or on the outside of the coach? A. It was outside of the coach. Q. Could he have kicked the boy ? A. Yes.”
The learned counsel, referring to the claim that Smith was acting for the defendant, as their employe or under circumstances which made the defendant liable for his conduct, say: “On the next proposition the evidence of plaintiff does not make even a prima facie showing”.
The following is the evidence, and all the evidence in the record, except that of Smith, upon the subject of that individual’s employment at or about the time of the accident.

G. IS. Richler.

“Q. Are you acquainted with Tony Smith ? A. Yes, sir. Q. Do you know whether or not he is employed by the Cotton Belt Road? A. I cannot say positively? Q. What do you mean? A. I cannot say positively, because I do not know whether he is employed by them or not. Q. Did you see him during the month of July, last summer, working for the Cotton Belt? A. I cannot say that positively. Q. What did you see him doing ? A. I saw him on the cars, the same as other parties, chasing the boys off the cars. Q. Can you say whether or not he was employed by the company? A. I do not know. Q. You saw him keeping boys off the train? A. I saw him running the boys. Q. In July last? A. Yes. * * * Q. Did he seem to be working pretty energetically at that — chasing the boys away ? A. Yes, sir. Q. At the time there were two trains a day? A. Yes, sir. Q. He seemed to be working vigorously at chasing the boys ? A. He had to be light-footed to catch them, and he caught very few. * * * Q. Did you ever see Tony Smith working on the Cotton Belt train immediately after the injury to Louis Craig? A. Yes, sir. Yes, sir; I saw him one, two, or three days after that. Cross-examination. Q. You saw this man Tony Smith, on the cars passing- back and forth, but you do not know whether he was on the pay roll of the company, or employed by the company? A. No, sir; I do not know whether he was or not. I saw him on the ears chasing the boys. Q. You have seen other men on the other train *1716 keeping them off, too? A. I have seen Trout; he had them getting off the top sometimes, as well as off the platform.”

C. E. Jones.

“Q. Are you acquainted with Tony Smith? A. Yes, sir. Q. Have you ever seen him chase boys off the Cotton Belt train ? A. Yes, sir; I have seen him chase boys off the Cotton Belt train, and Jj have seen him chase them off of the V., S. & P. train, also. Q. Do you know whether he is employed by the Cotton Belt? A. No, sir; I do not. Q. Do you know whether he was employed by the Cotton Belt last summer ? A. I do not remember the date, but for quite a while he was employed there. He has been employed mostly in the yard. I do not know what train it was exactly, but it was some time during the present summer. He was employed in the yard mostly for three or four years. Q. What were the general orders to the men working in the yards in reference to these boys jumping on and off the trains? A. We have all got instructions to keep them off there, if possible. Q. What position do you hold? A. Train inspector of the V., S. & P. Railroad, Cross-examined. Q. Is it a matter of great annoyance and trouble to the V., S. & Pacific and the Cotton Belt people to keep these little boys off the train? A. Yes, sir.”

Ed. Wcdlcer.

“Q. Did you ever see Tony Smith apparently working on any Cotton Belt train this summer? A. I saw him going backward and forward on the train. Q. Did you see him chasing boys off the train ? A. On one night the V., S. & P. train came in about seven o’clock, and Willie Weekly jumped on, and I think it was Tony Smith that caught him. He chased him and grabbed him around the shoulders; it was at night, but I think it was Tony Smith.”
IF. A. Nelson (Chief of Police, of Shreveport).
“Q. During the month of July, last, was Tony Smith a police officer of the city of Shreveport? A. Yes; special watchman for the railroad company; watched the bridge down there and had authority to act as policeman. Q. Paid by the city? A. No, sir. Q. He is a special watchman in every sense of the word? A. Yes. Q. Do other special watchmen throughout town have authority of policemen? A. Yes. Q. He (Smith) is paid for working for private parties? A. Yes. The railroad has him employed, just the same as watchmen are employed by the banks. Cross-examined. Q. How did this special watchman come to be appointed? A. The railroad companies asked us to do it; they *1717 wanted a watchman down by the bridge, and then, too, there are disturbances on the cars — frequently there are. Q. Was there some complaint about little negroes jumping on and off the trains ? A. Yes, sir; that is the reason we appointed him, and gave him the same authority as a policeman. Last fall Mr. Hearn asked me for a man, and he paid him for that special purpose.”
Now, it is true that Smith himself testifies that he was not in the employ of the Cotton Belt, though he had been, off and on, for years, but he also testifies that he did not chase boys off the train, and continues as follows:
“Q. You can positively swear that you have not chased them off the Cotton Belt train? A. Yes, sir; I have not. Q. And you would not have done it under any circumstances? A. No; I would not. Q. Do you mean to say that if your duty to the Cotton Belt railroad called for such action on your part you would not have done it? A. No, I would not.” Which testimony is entirely irreeonfcilable with that before quoted, which was given by witnesses apparently as worthy of belief and certainly more disinterested than Smith. “But,” say the learned counsel: “We did not stop there” (with Smith’s testimony) “we put the whole train crew on the stand, from the conductor down, and each and every one of them, swears specifically as to who composed the train crew on the day of the accident.” This is quite true, but there are two things to be said in regard to the( testimony thus referred to, to-wit: First, that nobody pretends that Smith was a member of the train crew and, second, that the conductor, in his testimony, not only does not include Smith ns a member of the train crew, but gives us to understand that he was not on the train, though that fact can hardly be denied, and Smith swears that he was there for no other purpose than to pay a friendly visit to the conductor. In order that there may be no misunderstanding about the conductor’s testimony, we quote it:
J. A. Holmes sworn on behalf of defendant:
“Q. What is your occupation? A. I am a conductor. * * * * Q. Do you remember the time that the boy, Louis Craig, had his arm injured by being run over near the depot, here ? A. Yes. Q. Were you in charge of that train? A. Yes. * * * Q. (by jury). Of whom did the train crew consist? A. Of the conductor, the engineer, fireman and porters. Q. Did anybody else have any business on that train ? A. The car tenders. Q. Was anybody else — anyone other than these, *1718 allowed on the train? A. No, sir. Q. Anybody else that got on, besides the train crew and car tenders, would have to get off? A. Yes.” Smith, upon the other hand, testifies as follows: “Q. Are you in the habit of riding on that train? A. Yes, I have been. Q. The conductor knows you? A. Yes. Q. The train men know you? A. Yes. (By the Court): Q. Why did you take that train at the bridge and go back on the same towards the freight yard ? A. I had not seen Holmes for a long time, and I wanted to see him and ask him how he had been getting along. (Counsel continues). Q. You say you had not seen him for a long time? A. No, I have not seen him for a long time. Q. Do you mean to say that he had not been on the train for a long time? A. Not down here. Q. He was just recently on down here? A. Yes. Q. The other conductor you have seen frequently ? A. Yes.”
With the testimony which we have thus quoted in the record, it seemed rather significant that no officer or person connected with the defendant company should have taken the stand to say that Smith was not acting for it, or with its authority, in ejecting the plaintiff from its train. But let it be conceded, arguendo, that that circumstance is not to be taken as corroborating the testimony tending to show that Smith was employed by the defendant, the affirmative evidence on that subject still remains; and, were it not for the statement of fact which the counsel make in their brief for rehearing and the affidavits of other persons, which they have attached thereto, it would seem sufficient for the purpose, without corroboration. And, supposing that the evidence in the record is to be controlled by statements and ex parte affidavits, outside the record, presented after the case has been decided on appeal, and that it should be held that Smith was not, at the moment of the infliction of the injury upon the plaintiff, in the employ of the defendant, to the knowledge of the counsel, or of the officers who have furnished the affidavits mentioned, the fact still remains that he was, and had been, and continued to be, engaged in the business of ejecting boys from defendant’s trains, and it would be unreasonable where an individual is permitted to travel back and forth on the trains of a railway company, discharging certain functions, to all appearances as though he were employed for that purpose, to permit such company to escape the consequences of his acts, done in the course of such apparent employment. Cooley on Torts, 622, 623, 624; Lampkin vs. Railway Co., 42 Ann., 997; Althorf vs. Wolfe, 27 N. Y., 355.
*1719 The manner in which the testimony was given led the court into a misapprehension as to the possible relations existing between the defendant company and the Vicksburg, Shreveport and Pacific Railroad Company; but it is a matter of no consequence, and has no bearing upon the result.
Rehearing refused.